**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

VERMONT PENSION INVESTMENT
COMMITTEE and WASHINGTON STATE
INVESTMENT BOARD, Individually and on
Behalf of All Others Similarly Situated,

                             Plaintiffs,

          vs.

BANK OF AMERICA, NATIONAL
ASSOCIATION and U.S. BANK NATIONAL
ASSOCIATION,

                           Defendants.

**CIVIL ACTION NO.: _____**


**CLASS ACTION COMPLAINT**


**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................... i

NATURE OF THE ACTION AND OVERVIEW ...................................................................... 1

JURISDICTION AND VENUE ............................................................................................ 6

PARTIES ..................................................................................................................... 6

FACTUAL ALLEGATIONS ................................................................................................ 7

    I.      The MBS Securitization Process and the WaMu Trusts ......................................... 7

    II.     The Trustees' Obligations to the WaMu Trusts' Certificateholders ................... 13

          A.     The Trustee's Duties and Obligations Under The PSAs .......................... 14

          B.     The Trustees' Duties and Obligations Under The TIA ............................ 19

    III.    The Trustees Knew That WaMu's Representations and Warranties Were False and Mortgage Files Were Defective ..................................................... 21

          A.     Public Reports Alerted the Trustees to Defective Mortgage Files and Breaches of WaMu's Representations and Warranties ............................ 21

          B.     The WaMu Trusts' Significant Losses and Delinquencies Alerted the Trustees to Breaches of WaMu's Representations and Warranties .......... 29

    IV.    Defendants Have Failed To Take Required Actions to Protect Certificateholders .......................................................................................... 34

    V.     The Trustees Are Responsible To Certificateholders For The Credit Losses In The WaMu Trusts ...................................................................................... 40

CLASS ACTION ALLEGATIONS ..................................................................................... 40

FIRST CLAIM ............................................................................................................. 43

SECOND CLAIM .......................................................................................................... 44

PRAYER FOR RELIEF ................................................................................................... 46

JURY TRIAL DEMANDED ............................................................................................. 47

## NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs Vermont Pension Investment Committee and Washington State Investment Board (collectively, "Plaintiffs") allege the following based upon the investigation of Plaintiffs' counsel except as to allegations pertaining specifically to Plaintiffs, which are based on personal knowledge.  Counsel's investigation included, *inter alia*, a review of defendants' and third-party public documents, United States Securities and Exchange Commission ("SEC") filings, and the pleadings and orders docketed in *Policemen's Annuity and Benefit Fund of the City of Chicago, et al. v. Bank of America, NA, et al.*, No. 12-cv-2865 (KBF) (S.D.N.Y.).

2.      Plaintiffs bring this action, on their own behalf and on behalf of a class, against Defendants Bank of America, National Association ("BOA") and U.S. Bank National Association ("U.S. Bank," and collectively with BOA, the "Trustees"), in their capacity as the Trustees for the following six substantially similar mortgage-backed securities ("MBS") in which Plaintiffs and class members invested (collectively, the "WaMu Trusts"): Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2005-9 ("WMALT 2005-9"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-2 ("WMALT 2006-2"); Washington Mutual Mortgage Pass-Through Certificates, WMALT Series 2006-AR1 ("WMALT 2006-AR1"); WaMu Mortgage Pass-Through Certificates, Series 2005-AR15 ("WaMu 2005-AR15"); WaMu Mortgage Pass-Through Certificates, Series 2005-AR19 ("WaMu 2005-AR19"); and WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 ("WaMu 2006-AR19").

3.      Each of the WaMu Trusts owns residential mortgage loans that were bundled together and sold to investors in the form of MBS trust certificates (the "WaMu Trust Certificates").  Plaintiffs were beneficiaries of the WaMu Trusts and, along with other class

members (collectively, the "Certificateholders"), suffered losses as a result of Defendants' wrongdoing.

4.      In addition to the Trustees, five other principal entities are involved in the creation and administration of each of the WaMu Trusts: (i) the "Originator" – Washington Mutual Bank ("WMB") – who reviews mortgage loan applications and adherence to the mortgage loan underwriting process; (ii) the "Seller" – WMB or Washington Mutual Mortgage Securities Corp. ("WMMSC") – who accumulates and bundles mortgages together in large pools to sell to the depositor; (iii) the "Depositor" – WaMu Asset Acceptance Corp. ("WMAAC") or WMMSC – who transfers the mortgage pools into a trust specifically created for the MBS; (iv) the "Underwriter" – WaMu Capital Corp. ("WMCC") – who underwrites the offering of the certificates issued by the MBS trust; and (v) the "Servicer" – WMB – who thereafter collects and accounts for principal and interest payments, and manages delinquent payments and foreclosures.   WMB, WMMSC, WMAAC, and WMCC are all subsidiaries and affiliates of Washington Mutual, Inc. (collectively with its subsidiaries, "WaMu").

5.      Defendants, as the Trustees[1] for the WaMu Trusts, owed the Certificateholders certain contractual duties derived from each of the substantially similar Pooling and Servicing Agreements ("PSAs") governing the WaMu Trusts.[2]  The Trustees also owed Certificateholders

---

[1]      The "Original Trustee" for each of the WaMu Trusts was LaSalle Bank National Association ("LaSalle").  LaSalle was replaced by BOA in October 2007 when BOA acquired LaSalle and became the "Successor Trustee" for the WaMu Trusts.  During 2008 and 2009, U.S. Bank became the Successor Trustee to certain of WaMu's MBS trusts.  In January 2011, U.S. Bank became the Successor Trustee for the remainder of WaMu's MBS trusts when it purchased BOA's securitization trust business.

[2]      As each of PSAs are substantially similar, the Complaint quotes only to the language from the PSA for WaMu Mortgage Pass-Through Certificates, Series 2006-AR19, attached hereto as Exhibit A.  The PSAs are incorporated by reference into this Complaint as if fully set forth herein.

statutorily imposed duties under the Trust Indenture Act of 1939 ("TIA"), as amended, 15 U.S.C. §77aaa, *et seq*.

6.      In terms of the Trustees' contractual obligations, the PSAs impose specific obligations that are meant to ensure that an independent actor protects the interests of the WaMu Trusts and their respective Certificateholders.

7.      For example, to ensure that the WaMu Trusts properly received ownership of the underlying mortgage loans, Section 2.07 of the PSAs requires the Trustees (or their agents) to take physical possession and acknowledge receipt of the mortgage files,[3] review the mortgage file documents for each of the mortgage loans included in the WaMu Trust, identify any mortgage loans that lacked a complete chain of title or that had missing documentation, and certify that the documentation for each of the remaining mortgage loans included in the WaMu Trusts was accurate and complete.  If the Trustees identify any defects in the mortgage files, Section 2.07 of the PSAs requires the Trustees to notify the Servicer, who was then required to take appropriate steps to enforce the Seller's obligation to cure, substitute, or repurchase mortgage loans with defective mortgage files.

8.      Similarly, to ensure the WaMu Trusts were investment worthy and the underlying loans were of an appropriate credit quality, the applicable Mortgage Loan Purchase Agreements ("MLPAs") for the WaMu Trusts contained "representations and warranties" from WaMu as to the characteristics of the mortgage borrowers, the collateral for the mortgage loans, and assurances that the mortgage loans were originated in accordance with applicable lending and

---

[3]      Section 1.01 of the PSAs defines the mortgage file as: (i) the original mortgage note; (ii) the buydown agreement (if applicable); (iii) the original recorded mortgage (or certified copy) with evidence of recording thereon for the jurisdiction in which the mortgaged property is located; and (iv) for any mortgage loan that has been modified or amended, the original instrument or instruments effecting such modification or amendment.

underwriting criteria.  Upon discovery of a breach of WaMu's representations and warranties affecting the underlying mortgage loans, Section 2.09 of the PSAs requires the Trustees to give notice of such breach to the Servicer, who was then required to take appropriate steps to enforce the Seller's obligation to cure, substitute, or repurchase affected mortgage loans.

9.      The failure of the Servicer to provide notice to the Seller of defects in mortgage files or breaches of WaMu's representations and warranties, or a failure of the Seller to cure, repurchase, or substitute mortgage loans with defective mortgage files or mortgage loans affected by breaches of WaMu's representations and warranties constitutes an "Event of Default" under Section 7.01(a)(ii) of the PSAs.  Pursuant to Section 8.01(a) of the PSAs, such an Event of Default triggers the Trustees' obligation to use all of its powers under the PSAs to protect the WaMu Trusts (and by extension, the Certificateholders) and to act with the same degree of care and skill as a prudent person would exercise in conducting their own affairs.  Additionally, Section 8.01(d) of the PSAs requires the Trustees to notify all Certificateholders of each Event of Default, unless such Event of Default shall have been cured or waived, within ninety days of the occurrence of the Event of Default.

10.     In addition to duties owed under the PSAs, the TIA imposes statutory obligations on the Trustees.  The TIA applies to each of the WaMu Trust Certificates.  As detailed herein, the TIA requires the Trustees to "give to the indenture security holders … notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b). Accordingly, the TIA required the Trustees to inform the Certificateholders of Events of Default – including WaMu's failure as the Seller to cure, substitute, or repurchase mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties – within ninety days of their occurrence.

11.     Like the PSAs, the TIA also requires, upon an Event of Default, the Trustees to use all of its powers under the PSAs to protect the WaMu Trusts (and by extension, the Certificateholders) and to act with the same degree of care and skill as a prudent person would exercise in conducting their own affairs.  15 U.S.C. §77ooo(c).

12.     As detailed herein, the Trustees, despite knowledge of defective mortgage files and breaches of WaMu's representations and warranties (including WaMu's deficient lending and underwriting practices) since at least November 2007, breached their contractual and statutory duties and obligations under the PSAs and the TIA by, *inter alia*, failing to:

- **provide the required notice to WaMu of defective mortgage files and breaches of WaMu's representations and warranties** (as required by Sections 2.07 and 2.09 of the PSAs);

- **take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties** (as required by Section 8.01(a) of the PSAs and the TIA, 15 U.S.C. §77ooo(c)); and

- **provide the required notice to the Certificateholders of Events of Default** including WaMu's failure to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties (as required by Section 8.01(d) of the PSAs and the TIA, 15 U.S.C. §77ooo(b)).

13.     Beginning by at least early 2008, the mortgage loans in the WaMu Trusts started experiencing high levels of payment delinquencies, defaults (where the borrower loses title to the property), and substantial credit losses.  Despite mounting losses, a Congressional investigation, related MBS litigation, and journalists' reports on WaMu's underwriting practices, the Trustees, in violation of their contractual and statutory obligations, sat idly by while trustees of other WaMu MBS trusts (such as Deutsche Bank National Trust Company ("Deutsche Bank")) were acting to protect certificateholders.

14.     Defendants' failure to perform their contractual and statutory duties and obligations under the PSAs and the TIA have resulted in the failure of payment of principal and interest to Certificateholders, rating agency downgrades, and declines in the value of the WaMu Trust Certificates.

15.     Defendants' contractual breaches and TIA violations have caused the Certificateholders to suffer significant damages.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are hundreds, if not thousands, of potential class members; the aggregate amount in controversy exceeds the jurisdictional amount or $5,000,000.00; and Defendants are citizens of a State different from that of Plaintiffs and the class.  This Court also has subject matter jurisdiction over Plaintiffs' and the proposed class' claims pursuant to 28 U.S.C. §1367(a).

17.     Venue is proper in this District under 28 U.S.C. §1391(b).

## PARTIES

18.     Plaintiff Vermont Pension Investment Committee invested in the following WaMu Trust Certificates: WMALT 2005-9 (3CB tranche); WMALT 2006-2 (2CB tranche); WaMu 2006-AR19 (1A1A tranche).

19.     Plaintiff Washington State Investment Board invested in the following WaMu Trust Certificates: WMALT 2006-AR1 (A1A tranche); WaMu 2005-AR15 (A1A2 tranche); and WaMu 2005-AR19 (A1A2 tranche).

20.     Defendant BOA is a national banking association with its principal offices in Charlotte, North Carolina. In October 2007, BOA acquired LaSalle (which was serving as the Original Trustee for the WaMu Trusts) and became a Successor Trustee to the WaMu Trusts via its merger with LaSalle.   As trustees for the WaMu Trusts, LaSalle and BOA owed the Certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the WaMu Trusts.

21.     Defendant U.S. Bank is a national banking association with its principal offices in Minneapolis, Minnesota.   During 2008 and 2009, U.S. Bank became a Successor Trustee to certain WaMu MBS trusts, and in January 2011, succeeded BOA as Successor Trustee for the remaining WaMu MBS trusts when it purchased BOA's securitization trust business.   As a trustee for the WaMu Trusts, U.S. Bank owed the Certificateholders certain statutory and contractual duties with respect to the mortgage loans owned by the WaMu Trusts.

22.     Non-party Washington Mutual was a savings bank holding company and the former owner of WMB, one of the largest savings and loan associations until its collapse in 2008.   Relevant hereto, Washington Mutual's subsidiaries included WMB, WMMSC, WMAAC and WMCC.   As noted above, the Washington Mutual entities are collectively referred to as "WaMu."

**FACTUAL ALLEGATIONS**

**I.     The MBS Securitization Process and the WaMu Trusts**

23.     The traditional model for a mortgage loan involved a lending institution (*i.e.*, the loan originator) extending a loan to a prospective home buyer in exchange for a promissory note from the home buyer to repay the principal and interest on the loan.   The loan originator also held a lien against the home as collateral in the event the home buyer defaulted on the obligation. Under this model, the loan originator held the promissory note until it matured and was exposed

to the concomitant risk that the borrower may fail to repay the loan. As such, the loan originator had a financial incentive to ensure that the borrower had the financial wherewithal and ability to repay the promissory note, and the underlying property had sufficient value to enable the originator to recover its principal and interest in the event that the borrower defaulted on the promissory note.

24.     Beginning in the 1990s, low interest rates and low inflation led to an increased demand for mortgages. Banks and other mortgage lending institutions took advantage of this opportunity and introduced expanded financial innovations in the form of "asset securitizations" to finance the expanding mortgage market. These innovations altered the foregoing traditional lending model, severing the traditional direct link between borrower and lender, and the risks associated with mortgage loans.

25.     Unlike the traditional lending model, an asset securitization involves the sale and "securitization" of mortgages. Specifically, after a loan originator issues a mortgage to a borrower, the loan originator sells the mortgage in the financial markets to a third-party financial institution. By selling the mortgage, the loan originator obtains fees in connection with the issuance of the mortgage, receives upfront proceeds when it sells the mortgage into the financial markets, and thereby has new capital to issue more mortgages.

26.     The mortgages sold into the financial markets are typically pooled together and securitized into what are commonly referred to as MBS. In addition to receiving fees from the sale of the mortgage, the loan originator is no longer subject to the risk that the borrower may default. Rather, that risk is transferred with the mortgages to investors who purchase the MBS, who are in turn dependent on the MBS trustee to protect their interests if it is discovered that

mortgage loans contained in the MBS trusts were not originated in accordance with stated underwriting guidelines, or in accordance with other representations and warranties.

27.     As illustrated below, in a mortgage securitization, mortgage loans are acquired, pooled together or "securitized," and then sold to investors in the form of MBS certificates, whereby the investors acquire rights in the income flowing from the underlying mortgage pools.



(Source: *The Wall Street Journal*)

28.     MBS certificates entitle investors to the cash flows generated from the principal and interest payments on underlying pools of mortgage loans.  When mortgage borrowers make interest and principal payments as required by the underlying mortgages, the cash-flow is distributed to the holders of the MBS certificates in order of priority based on the specific tranche held by the MBS investors.  Typically, each MBS consists of several tranches or levels, with the highest tranche (also referred to as the "senior tranche") being the first to receive its share of the mortgage proceeds and is also the last to absorb any losses should mortgage-borrowers become delinquent or default on their mortgage.  Since the investment quality and risk of the higher tranches is affected by the cushion afforded by the lower tranches, diminished cash flow to the lower tranches results in impaired value of the higher tranches.[4]

---

[4]     *See*, *e.g.*, WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Trust Prospectus Supplement, at S-13 "Distributions on the Certificates," attached hereto as Exhibit B. As each of the prospectus supplements for the WaMu Trusts are substantially similar, the

29.     The process of distributing the mortgage proceeds continues down the tranches through to the bottom tranches (referred to as "equity tranches").  This process is repeated each month and all investors receive the payments owed to them so long as the mortgage-borrowers are current on their mortgages.

30.     Given this structure, certificateholders in lower tranches are exposed to the greatest risk that they will receive only a portion, or potentially none, of their anticipated principal and interest payments if the underlying pools of mortgages experience significant rates of default.[5]  In return for the higher risks, the lower tranches receive higher yields.  The graphic below illustrates a simplified MBS tranche structure:



31.     Each MBS tranche received credit ratings from the credit rating agencies (typically Standard & Poor's ("S&P") and Moody's Investors Service ("Moody's" and collectively with S&P, the "Rating Agencies").  In analyzing credit risk, the Rating Agencies focused on, among other things: the credit quality of the collateral (the borrowers' ability to pay and the borrowers'

_____

Complaint cites only to the WaMu Mortgage Pass-Through Certificates, Series 2006-AR19 Trust Prospectus Supplement.

[5]      *See*, *e.g.*, *id.* at S-18 "Allocation of Losses."

equity in the assets); the quality of the seller and servicer; and the payment structure (the extent to which the cash flow from collateral can satisfy the obligations of the MBS).

32.     In the typical MBS structure (and with the WaMu Trusts here), the trust's senior tranches received the highest possible investment ratings from the Rating Agencies, usually "AAA" or "Aaa."   After the senior tranche, the middle tranches (referred to as "mezzanine tranches") next receive their share of the proceeds.   In accordance with their order of priority, the mezzanine tranches were generally rated from "AA" to "BB" by the Rating Agencies.[6]

33.     The creation or securitization of a MBS initially involves four principal entities: the mortgage originator; the seller; the depositor; and the MBS underwriter.   WaMu, through its various corporate entities, served as each of the four entities during the creation of the WaMu Trusts that are the subject of this action:

- As the Originator, WMB originated mortgages and/or acquired mortgages from other lenders;

- As the Seller, WMB or WMMSC bundled the mortgages together in large pools and sold them to the Depositor;

- As the Depositor, WMAAC or WMMSC purchased and then transferred the mortgage pools into a specifically created trust in return for WaMu Trust Certificates; and

- As the Underwriter, WMCC sold the WaMu Trust Certificates to the Certificateholders.[7]

34.     After a WaMu Trust is securitized, the Servicer (WMB) is responsible for collecting principal and interest payments from the homeowners/borrowers in the underlying

---

[6]     *See, e.g.*, *id.* at S-20 "Ratings."

[7]     *See, e.g.*, *id.* at S-5 "Transaction Participants."

mortgages and for distributing those payments to the WaMu Trust – ultimately for distribution to Certificateholders pursuant to a payment schedule (sometimes referred to as a "waterfall").[8]

35.     The other key participant in the operation of a MBS is the trustee – the party responsible for fulfilling several roles to ensure that the MBS is properly populated and administered pursuant to its governing documents.

36.     As discussed herein, the Defendant Trustees' contractual responsibilities are set forth in the PSAs governing each of the WaMu Trusts.  The PSAs are filed with the SEC, in addition to prospectuses and prospectus supplements for each WaMu Trust.

37.     The following graphic illustrates the transactions and relationships between the participants in the creation and administration of the WaMu Trusts:



---

[8]        *See*, *e.g.*, *id.* at S-13 "Distributions on the Certificates."

38.     Ultimately the value of the WaMu Trust, and the WaMu Trust Certificates' credit ratings, depends on the riskiness of the underlying mortgages (which is reflected in the Seller's representations and warranties concerning the quality of loans in the pool) and, secondarily, to the extent that borrowers default on their payments, on the WaMu Trust's ability to recover the unpaid loan balance or substitute conforming loans for non-conforming loans.

39.     If the mortgage loans underlying the WaMu Trusts suffer payment defaults in excess of the assumptions built into their structure, investors may suffer significant losses as the securities may be re-rated by the Rating Agencies and the value of the WaMu Trust Certificate may decline.

## II.     The Trustees' Obligations to the WaMu Trusts' Certificateholders

40.     As Trustees, the Defendants were (and are) responsible under federal law and the PSAs for protecting the Certificateholders from WaMu's deficient lending, underwriting, and servicing practices and/or notifying Certificateholders of Events of Default.

41.     However, and as detailed below, many WaMu-originated loans failing to meet stated underwriting guidelines were packaged as MBSs and sold to Certificateholders without any corrective action by the Trustees since their creation, despite the Trustees' knowledge of the deficiencies and their clear duty to take corrective action and notify the Certificateholders under the PSAs and the TIA.

42.     The purpose of having a trustee in a MBS securitization is to ensure that there is at least one independent party to the PSA who, unlike the other parties to the PSA, is specifically entrusted by certificateholders to protect the trust's and the certificateholders' interests.  As such, the PSAs and the TIA impose critical duties on the Defendants, as Trustees, to act as a prudent person in the protection of the WaMu Trusts' and Certificateholders' interests.

43.     The WaMu Trusts' PSAs (and related agreements) specifically set forth the Trustees' duties.  As noted above, each of the PSAs for the WaMu Trusts is substantially similar and imposes the exact same duties on the Trustees.

**A.     The Trustees' Duties and Obligations Under The PSAs**

**i.     *The Trustees' Duty to Enforce WaMu's Obligation to Cure, Substitute, or Repurchase Mortgage Loans With Incomplete or Defective Mortgage Files***

44.     To ensure that the mortgage loans were properly conveyed to the WaMu Trusts, and that the WaMu Trusts had received perfected and enforceable title to the mortgage loans supporting the entire MBS structure, the PSAs require the Trustee (or its agent) to review mortgage files for each mortgage loan in the WaMu Trusts, to identify any mortgage loans that lacked a complete chain of title or contained missing documentation, and to certify that the documentation for each of the remaining mortgage loans in the WaMu Trusts was accurate and complete.

45.     Specifically, Section 2.05 of the PSAs ("Delivery of Mortgage Files") requires WaMu to "deliver to and deposit with, or cause to be delivered to and deposited with, the Trustee … the Mortgage Files, which shall at all times be identified in the records of the Trustee … as being held by or on behalf of the Trust."  Furthermore, Section 2.07 of the PSAs ("Acceptance by Trustee") requires that the Trustee "acknowledge[] receipt … on behalf of the Trust of the [mortgage files]" and "acknowledge[] that all Mortgage Pool Assets, Mortgage Files and related documents and property held by it at any time are held by it as Trustee of the Trust…."

46.     Similarly, Section 2.11 of the PSAs ("Acknowledgement of Transfer of Mortgage Pool Assets") states that "[t]he Trustee hereby acknowledges and accepts on behalf of the Trust the transfer and assignment … of the Mortgage Pool Assets …."

47.     Once the mortgage files are in the Trustees' possession, Section 2.07 of the PSAs requires the Trustees to ensure that the underlying mortgage loans were properly conveyed to the WaMu Trusts, and that the WaMu Trusts had perfected and enforceable title to the mortgage loans by reviewing the mortgage files for each of the mortgage loans.  Specifically, Section 2.07 of the PSAs requires that the Trustees "***review … each Mortgage File within 45 days after the Closing Date and deliver to the [Depositor] a certification*** [that] all documents required … pursuant to the definition of 'Mortgage File' and Section 2.05 have been executed and received…."[9]

48.     If the Trustees identify any defect in a mortgage file for an underlying mortgage contained in a WaMu Trust, Section 2.07 of the PSAs dictates that "the Trustee ***shall promptly so notify*** the Servicer" and "the Servicer ***shall promptly notify*** the applicable Seller of such defect and take appropriate steps on behalf of the Trust to enforce such Seller's obligation … to ***correct or cure*** such defect or ***repurchase or substitute*** for such Mortgage Loan…."

49.     As set forth in Section 7.01(a)(ii) of the PSAs ("Events of Default"), an "Event of Default" occurs if either the Servicer fails to provide notice to the Seller of defects in mortgage files or the Seller fails to cure, repurchase, or substitute the mortgage loans with defective mortgage files as required by Section 2.07 of the PSAs.

50.     The occurrence of an Event of Default triggers the Trustees' obligation under Section 8.01(a) of the PSAs ("Duties of Trustees") to "***exercise such of the rights and powers vested in it by [the PSAs] and use the same degree of care and skill in its exercise as a prudent person would exercise or use*** under the circumstances in the conduct of such person's own affairs."  Additionally, "[w]ithin 90 days after the occurrence of any Event of Default known to

---

[9]      Unless otherwise indicated, all emphases herein are added.

the Trustee," the Trustees are required under Section 8.01(d) of the PSAs to "***transmit by mail to all Certificateholders … notice of each Event of Default***, unless such Event of Default shall have been cured or waived."

51.    Section 8.01(c) of the PSAs further provides that the Trustees' failure to provide notice to the Servicer of defects in mortgage files does not prevent the triggering of an Event of Default where the Trustees' failure to provide notice was the result of the ***Trustees' own negligence*** or willful misconduct, stating that "[n]o provision of this Agreement shall be construed to relieve the Trustee … from liability for its own negligent action, its own negligent failure to act or its own willful misconduct…."

52.    In summary, the PSAs require the Trustees to:

- **review each mortgage file** for the underlying loans and certify that the mortgage file is complete and accurate (as required by Section 2.07 of the PSAs);

- **provide the required notice to WaMu of defective mortgage files** (as required by Section 2.07 of the PSAs);

- **take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files** (as required by Section 8.01(a) of the PSAs); and

- **provide the required notice to the Certificateholders of Events of Default**, including WaMu's failure to cure, repurchase, or substitute mortgage loans with defective mortgage files (as required by Section 8.01(d) of the PSAs).[10]

---

[10]    As set forth in Section 8.08 of the PSAs ("Successor Trustee"), these duties pass from the Original Trustee to any Successor Trustee: "Any successor trustee appointed … shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee or Delaware Trustee herein."

   **ii.**  ***The Trustees' Duty to Enforce WaMu's Obligation to Cure, Substitute,***
      ***or Repurchase Mortgage Loans That Breach WaMu's Representations***
      ***and Warranties***

  53.  The Trustees were also entrusted to ensure that mortgage loans in the WaMu

Trusts were properly underwritten, were of a certain risk profile, and had characteristics of a

certain quality as represented by WaMu in the MLPAs.

  54.  Specifically, each MLPA between the Seller and the Depositor contained

"representations and warranties" from the Seller as to the characteristics of the mortgage

borrower, the collateral for the mortgage loans, and assurances that the mortgage loans were

made in accordance with applicable underwriting criteria.  *See* ¶69, *infra*.  Pursuant to Section

2.09 of the PSAs ("Representations and Warranties of the Seller Concerning the Mortgage

Loans"), the Trust received an assignment of "all of [the Depositor's] rights under the Mortgage

Loan Purchase Agreement" pertaining to the mortgage loans.

  55.  Populating MBSs with loans conforming to the Seller's stated representations

and warranties is critical to assessing the value of a MBS.  As Defendant U.S. Bank, in its capacity as

trustee for two Merrill Lynch Mortgage Investors Trusts, stated:

> ***The accuracy of the representations and warranties were a key***
> ***component to closing a securitization transaction*** because, among
> other reasons … investors were not given access to the related loan
> origination files and could not have independently confirmed the
> loans' credit characteristics. Accordingly, ***the veracity of these***
> ***representations and warranties were the drivers of the loans' risk***
> ***profile***.[11]

  56.  Additionally, the Rating Agencies used the representations and warranties

regarding mortgage loans in the WaMu Trusts to assess the quality and risk of the WaMu Trust

---

[11]  *Merrill Lynch Mortgage Investors Trust, Series 2006-RM4, et al. v. Merrill Lynch Mortg.*
*Lending, Inc., et al.*, Index No. 654403/2012, Dkt. No. 2 (N.Y. Sup. Ct.), attached hereto as
Exhibit C.

Certificates and assign a rating to the various tranches in the WaMu Trust.  Due in large part to the representations and warranties regarding the underlying mortgage loans contained in the WaMu Trusts, many of the WaMu Trust Certificates received "AAA" investment grade ratings from the Rating Agencies.  *See* ¶90.

57.     To protect Certificateholders, if mortgages included in the WaMu Trusts failed to conform to the Seller's representations and warranties, Section 2.09 of the PSAs requires the Seller to cure, substitute, or repurchase any of the mortgage loans that are materially affected by breaches of the Seller's representations and warranties.  As set forth in Section 2.09 of the PSAs, the Trustees, upon actual knowledge of "a breach of any of the representations and warranties … that materially and adversely affects the value of the related Mortgage Loans or the interests of the Trust in the related Mortgage Loans, *… shall give prompt written notice* to [the Servicer]" and "[t]he Servicer *shall promptly* notify the applicable Seller of such breach and *take appropriate steps on behalf of the Trust to enforce such Seller's obligation … to cure such breach in all material respects or repurchase or substitute for the affected Mortgage Loan or Mortgage Loans*…."

58.     If the Servicer does not then act to require the Seller to cure, substitute, or repurchase mortgage loans affected by breaches of WaMu's representations and warranties an "Event of Default" occurs under Section 7.01(a)(ii) of the PSAs.

59.     As with an Event of Default arising out of defective mortgage files, once an Event of Default stemming from a breach of the representations and warranties has occurred, Section 8.01(a) of the PSAs requires the Trustees to "*exercise such of the rights and powers vested in it by [the PSAs] and use the same degree of care and skill in its exercise as a prudent person would exercise or use* under the circumstances in the conduct of such person's own affairs."

Additionally, "[w]ithin 90 days after the occurrence of any Event of Default known to the Trustee," the Trustees are required under Section 8.01(d) of the PSAs to "*transmit by mail to all Certificateholders … notice of each Event of Default*, unless such Event of Default shall have been cured or waived."

60.     As with the provisions discussed above, Section 8.01(c) of the PSAs provides that the Trustees' failure to give notice to the Servicer would not prevent the triggering of an Event of Default should the Trustees' failure result from the Trustee's negligence or willful misconduct, as "[n]o provision of this Agreement shall be construed to relieve the Trustee … from liability for its own negligent action, its own negligent failure to act or its own willful misconduct."

61.     In summary, the PSAs require the Trustees to:

- **provide the required notice to WaMu of breaches of WaMu's representations and warranties in the MLPAs** (as required by Section 2.09 of the PSAs); and

- **take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans affected by breaches of WaMu's representations and warranties** (as required by Section 8.01(a) of the PSAs); and

- **provide the required notice to the Certificateholders of Events of Default**, including WaMu's failure to cure, repurchase, or substitute mortgage loans affected by breaches of WaMu's representations and warranties (as required by Section 8.01(d) of the PSAs).[12]

**B.      The Trustees' Duties and Obligations Under The TIA**

62.     Concurrent with the Trustees' responsibilities under the PSAs, the TIA also imposes requirements on the Trustees.

---

[12]     As set forth in Section 8.08 of the PSAs ("Successor Trustee"), these duties pass from the Original Trustee to any Successor Trustee: "Any successor trustee appointed … shall become fully vested with all the rights, powers, duties and obligations of its predecessor hereunder, with like effect as if originally named as Trustee or Delaware Trustee herein."

63.     Specifically, Section 315(b) of the TIA requires the Trustees to "***give to the indenture security holders … notice of all defaults known to the trustee***, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).

64.     Accordingly, the TIA requires the Trustees to inform the Certificateholders of any Events of Default – including WaMu's failure as the Seller to cure, substitute, or repurchase mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties – within ninety days of their occurrence.

65.     Upon an Event of Default, Section 315(c) of the TIA, like Section 8.01(a) of the PSAs, also requires the Trustees to exercise "such of the rights and powers vested in it by such indenture, and to ***use the same degree of care and skill in their exercise, as a prudent man would exercise or use under the circumstances in the conduct of his own affairs***."  15 U.S.C. §77ooo(c).

66.     Thus, the TIA requires the Trustees to enforce, as a prudent person would, WaMu's obligation as the Seller to cure, substitute, or repurchase mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties.

67.     As with the Trustees' obligations under the PSAs, the TIA does not relieve the Trustees of their obligations where WaMu did not fulfill its obligations as the Seller to cure, substitute, or repurchase mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties at the result of the Trustees' own negligence or willful misconduct in failing to provide notice to the Servicer.  *See* 15 U.S.C. §77ooo(d) ("The indenture to be qualified shall not contain any provisions relieving the

indenture trustee from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct….").

68.     Accordingly, the TIA requires the Trustees to:

- **take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties** (as required by 15 U.S.C. §77ooo(c)); and

- **provide the required notice to the Certificateholders of Events of Default** (as required by 15 U.S.C. §77ooo(b)).

**III.    The Trustees Knew That WaMu's Representations and Warranties Were False and Mortgage Files Were Defective**

    **A.     Public Reports Alerted the Trustees to Defective Mortgage Files and Breaches of WaMu's Representations and Warranties**

69.     As noted above, the PSAs for each of the WaMu Trust's incorporated the MLPAs and WaMu's representations and warranties concerning title to the mortgage loans, the characteristics of the borrowers and the collateral for the mortgage loans, and the credit criteria and underwriting practices for the origination of loans.   Specifically, WaMu represented and warranted that:  (i) each mortgage relating to a mortgage loan is valid and enforceable; (ii) that each mortgaged property had a free and clear title; (iii) that each mortgage loan complied with "all applicable local, state and federal laws, including, without limitation, usury, equal credit opportunity, disclosure and recording laws, and predatory and abusive lending laws"; (iv) that each mortgage and mortgage note is a legal, valid and binding obligation; (v) that each mortgage loan had a satisfactory appraisal; (vi) that each mortgage loan was "underwritten substantially in accordance with the applicable Underwriting Standards"; and (vii) that no mortgage loan had a loan-to-value ratio of greater than 100%.[13]

---

[13]     *See, e.g.*, Mortgage Loan Purchase and Sale Agreement, dated October 25, 2005, as applicable to WaMu 2006-AR19, attached hereto as Exhibit D.

70.     However, as discussed in greater detail below, Defendants knew (and continue to know) that the foregoing representations and warranties were false and that mortgage files for the underlying mortgage loans were defective.  Since at least November 2007, numerous MBS-related lawsuits, Congressional investigations, and news reports have demonstrated that WaMu, one of the largest mortgage loan originators in the MBS market between 2000 and 2007, systematically disregarded its stated lending and underwriting guidelines while pursuing the origination of an ever increasing number of loans irrespective of the quality of the loans – conduct that led WaMu to routinely approve improperly documented and originated loans which were subsequently packaged and sold to investors as MBSs.

71.     Each of these events independently and cumulatively alerted the Defendants, as Trustees for the WaMu Trusts, to the fact that the WaMu-originated mortgage loans contained in the WaMu Trusts were not of the quality represented by WaMu.

72.     For example, in November 2007, the New York Attorney General ("NYAG") filed a complaint against eAppraiseIT (at the time, one of the nation's largest real estate appraisal management companies) and its parent corporation for colluding with WaMu to inflate the appraised values of homes.[14]  The NYAG's action was widely reported at the time by publications including *The New York Times* and *The Wall Street Journal*.  After the case settled in September 2012, the NYAG issued a press release stating that "WaMu ***pressured*** eAppraiseIT to allow WaMu's loan officers to select property appraisers for WaMu-originated mortgages" which "led to ***inflated property valuations*** and enabled WaMu to originate a greater number of mortgages than would have been possible had appraisals been performed by fully independent

---

[14]     *See The People of the State of New York by Andrew Cuomo v. First Am. Corp. & First Am. eAppraiseIT,* Index No. 406796/2007 (N.Y. Sup. Ct.).

appraisers."[15]   *Contra* ¶69 (WaMu represented in the MLPAs that each mortgage loan had a satisfactory appraisal).

73.     On September 25, 2008, the Federal Deposit Insurance Corporation ("FDIC") seized WaMu and immediately sold the bank to JPMorgan Chase & Co. ("JPMC").

74.     On December 28, 2008, *The New York Times* published an investigative article detailing multiple instances of WaMu approving highly questionable loans based on inflated appraisals and inadequate proof of borrowers' ability to repay the loan.[16]   According to the article, "*[b]ecause WaMu was selling many of its loans to investors, it did not worry about defaults: by the time loans went bad, they were often in other hands*."[17]

75.     Two days later, on December 30, 2008, Deutsche Bank, who was the trustee for 99 other WaMu MBS trusts (the "WaMu-DB Trusts"), filed a proof of claim (the "Deutsche Bank Proof of Claim") with the FDIC.[18]   The Deutsche Bank Proof of Claim was brought by Deutsche Bank "as trustee … on behalf of itself, the [WaMu-DB] Trusts and the owners of certain residential mortgage backed securities issued by the [WaMu-DB] Trusts."[19]   Because the FDIC failed to respond to the Deutsche Bank Proof of Claim, on August 26, 2009, Deutsche Bank filed a federal lawsuit against the FDIC (as the receiver for WaMu) and others "on behalf

---

[15]     N.Y. Attorney General Eric T. Schneiderman, *A.G. Schneiderman Secures $7.8 Million Settlement With First American Corporation and eAppraiseIT For Role In Housing Market Meltdown*, Sept. 28, 2012, available at: http://www.ag.ny.gov/press-release/ag-schneiderman-secures-78-million-settlement-first-american-corporation-and, last accessed Aug. 16, 2013.

[16]     *See* Peter S. Goodman and Gretchen Morgenson, *Saying Yes, WaMu Built Empire on Shaky Loans*, THE NEW YORK TIMES, Dec. 27, 2008.

[17]     *Id.*

[18]     The Deutsche Bank Proof of Claim is attached hereto as Exhibit E.

[19]     Exhibit E.

of the [WaMu-DB] Trusts and the investors in the [WaMu-DB] Trusts" seeking to enforce the WaMu-DB Trusts' and certificateholders' rights (the "Deutsche Bank Litigation").[20]

76.     Additionally, on January 12, 2009, WaMu was sued under the Securities Act of 1933 (the "Securities Act") for misrepresentations in the offering documents for certain of its MBS trusts.[21]  Specifically, plaintiffs in the Securities Act class action alleged that the offering documents for the MBS trusts contained misstatements and omissions concerning the underwriting practices employed by WaMu in originating the mortgage loans which comprised the collateral loan pool for the MBS trusts' certificates.

77.     Further illustrative of WaMu's deficient lending and underwriting practices is the public report of the United States Senate Permanent Subcommittee on Investigations' entitled "WALL STREET AND THE FINANCIAL CRISIS: Anatomy of a Financial Collapse" (the "Senate Report").[22]  According to the Senate Report, *WaMu's "mortgage backed securities were among the worst performing in the marketplace due to poor quality loans that incurred early payment defaults, fraud, and high delinquency rates*."[23]  The Senate Report, issued in April 2011 after a two-year investigation (including multiple hearings) into the "root causes of the [2008] financial crisis," found that *WaMu had specifically engaged in*:

---

[20]     *Deutsche Bank Nat'l Trust Co. v. Fed. Deposit Ins. Corp., et al.*, No. 09-cv-1656, Dkt. No. 1 (D.D.C. filed Aug. 26, 2009).

[21]     *See In re Washington Mut. Mortg. Backed Sec. Litig.*, No. C09-37 MJP (W.D. Wash.).

[22]     *See* United States Senate Permanent Subcommittee on Investigations, *WALL STREET AND THE FINANCIAL CRISIS: The Role of High Risk Loans*, Apr. 13, 2011, available at: http://www.ft.com/cms/fc7d55c8-661a-11e0-9d40-00144feab49a.pdf, last Aug. 16, 2013.  Many of the findings contained in the Senate Report, and discussed herein, were first released to the public by the U.S. Senate Permanent Subcommittee on Investigations on April 12, 2010.  *See Senate Subcommittee Launches Series of Hearings on Wall Street and the Financial Crisis*, April 12, 2010, available at: http://www.levin.senate.gov/newsroom/press/release/?id=167e99b8-fa5a-4df8-9edb-6cae17673fc1, last accessed Aug. 16, 2013.

[23]     *Id*. at p. 122.

1.   **High Risk Lending Strategy.**   Washington Mutual ("WaMu") executives *embarked upon a High Risk Lending Strategy and increased sales of high risk home loans to Wall Street*, because they projected that high risk home loans, which generally charged higher rates of interest, would be more profitable for the bank than low risk home loans.

2.   **Shoddy Lending Practices.**   WaMu and its affiliate, Long Beach Mortgage Company ("Long Beach"), used shoddy lending practices *riddled with credit, compliance, and operational deficiencies* to make tens of thousands of high risk home loans that too often contained excessive risk, fraudulent information, or errors.

3.   **Steering Borrowers to High Risk Loans.**   WaMu and Long Beach too often steered borrowers into home loans they could not afford, allowing and encouraging them to make low initial payments that would be followed by much higher payments, and presumed that rising home prices would enable those borrowers to refinance their loans or sell their homes before the payments shot up.

4.   **Polluting the Financial System.**   WaMu and Long Beach securitized over $77 billion in subprime home loans and billions more in other high risk home loans, used Wall Street firms to sell the securities to investors worldwide, *and polluted the financial system with mortgage backed securities which later incurred high rates of delinquency and loss*.

5.   **Securitizing Delinquency-Prone and Fraudulent Loans**.   At times, *WaMu selected and securitized loans that it had identified as likely to go delinquent*, without disclosing its analysis to investors who bought the securities, *and also securitized loans tainted by fraudulent information*, without notifying purchasers of the fraud that was discovered.[24]

6.   **Destructive Compensation.**   WaMu's compensation system rewarded loan officers and loan processors for originating large volumes of high risk loans, paid extra to loan officers who overcharged borrowers or added stiff prepayment penalties, and gave executives millions of dollars even when its High Risk Lending strategy placed the bank in financial jeopardy.[25]

---

[24]      "In other words, even *loans marked with a red flag indicating fraud were being sold to investors*."  *Id.* at 125.

[25]      *Id.* at p. 50-51.

25

78.   The Senate Report cited a WaMu MBS trust (WMALT 2007-OC1), which is substantially similar to the WaMu Trusts at issue in this case, as an example of how WaMu's lending and underwriting practices led to defective mortgage loans collateralizing the Trust.  The Senate Report stated:

> In early 2008, for example, an investment adviser posted information on his personal blog about a WaMu-sponsored RMBS securitization known as WMALT 2007-OC1.  Formed in May 2007, this pool contained about 1,700 Alt A loans with a total outstanding balance of about $515 million. WaMu was the sole underwriter.  ***The credit rating agencies gave AAA and other investment grade ratings to more than 92% of the securitization, but within eight months, 15% of the pool was in foreclosure.***  The posting suggested that the poor performance of WaMu securities was systemic.[26]

79.   The Senate Report also noted that, as of December 2010, the total loan delinquency rate of the WMALT 2007-OC1 Trust was 57.37%.[27]

80.   Similarly, the Senate Report discussed the formation and performance of the WMALT 2007-OA3 Trust, another WaMu MBS trust that is substantially similar to the WaMu Trusts at issue in this Complaint.  In addition to specifically discussing how WaMu simply ignored the securitization agreements, which "prohibited the bank from using an 'adverse selection' process when including loans within a securitized pool," as well as the representations and warranties common in securitization transactions, the Senate Report stated:

> The Subcommittee uncovered an instance in 2007 in which ***WaMu securitized certain types of loans that it had identified as most likely to go delinquent***, but did not disclose its analysis to investors who bought the securities.  Investors who purchased these securities without the benefit of that analysis quickly saw the value of their purchases fall.

*       *       *

---

[26]   *Id.* at p. 124.

[27]   *Id.* at fn. 451.

WaMu emails and memoranda obtained by the Subcommittee indicate that, prior to assembling the loan pool used in the WMALT 2007-OA3 securitization, **WaMu identified delinquency-prone Option ARM mortgages** in its "Held for Investment" loan portfolio and transferred those loans to its portfolio of mortgages available for sale or securitization.  WaMu then used its "Held for Sale" loan portfolio to select the loans for the loan pool used in the WMALT 2007-OA3 securitization.  The prospectus provides a list of criteria used to select the loans in the WMALT 2007-OA3 loan pool, but **omits any mention of the fact that some of the loans were selected using statistical analysis designed to identify Option ARM loans likely to go delinquent quickly**.  The internal emails demonstrate that **WaMu selected delinquency-prone loans for sale in order to move risk from the bank's books to the investors in WaMu securities**, and profit from its internal analysis, which was not available to the market.[28]

81. The Senate Report also detailed a substantial amount of correspondence between senior executives of WaMu entities regarding their internal concern with certain loans, and ultimately, the decision to quickly change internal WaMu policies and sell those loans (the "Held-for-Sale portfolio") rather than keep them on the bank's book (the "Held-for-Investment portfolio").  The Senate Report then summarized how:

The internal WaMu documents and communications reviewed by the Subcommittee **strongly suggest that the decision** to transfer the most recently originated Option ARMs from the Held-for-Investment portfolio to the Held-for-Sale portfolio was **part of an effort to sell loans thought to be prone to delinquency, before they became delinquent**.  None of the hearing witnesses recalled how these loans were specifically selected for securitization, nor did any deny that they may have been selected for their propensity toward delinquency.

The Subcommittee investigation determined that WaMu carried out the plan as approved, and transferred at least $1.5 billion Option ARMs originated in the first quarter of 2007, from the [Held-for-Sale] to [Held-for-Sale] portfolio.  Of these loans, **about 1,900 with a total value of a little over $1 billion were assembled into a pool and used in the WMALT 2007-OA3 securitization in**

---

[28]     *Id.* at p. 125-26.

*March 2007*.  WMALT 2007-OA3 securities were issued with WaMu as the sole underwriter and sold to investors.

None of the materials associated with the sale of the WMALT 2007-OA3 securities informed investors of the process used to select the delinquency-prone Option ARMs from WaMu's investment portfolio and include them in the securitization.  Nor did WaMu inform investors of the internal analysis it performed to identify the delinquency-prone loans.

Senator Levin questioned Mr. Beck about this point at the April 13 Subcommittee hearing:

Senator Levin.  When you said that investors were told of the characteristics of loans, they were told of all the characteristics of loans.  Did they know, were they informed that loans with those or some of those characteristics had a greater propensity towards delinquency in WaMu's analysis?  Were they told that?

Mr. Beck [Head of WaMu's Capital Market Division].  They were not told of the WaMu analysis.

*Predictably, the securitization performed badly.*  Approximately 87% of the securities received AAA ratings.  Within 9 months, by January 2008, those ratings began to be downgraded.  *As of February 2010, more than half of the loans in WMALT Series 2007-OA3 were delinquent, and more than a quarter were in foreclosure.  All of the investment grade ratings have been downgraded to junk status, and the investors have incurred substantial losses.*[29]

82.    More recently, in July 2012, a court hearing the Securities Act claims (discussed in ¶76, above) against WaMu and underwriters of the MBSs alleging misrepresentations in MBS trust offering prospectuses denied defendants' motions for summary judgment based on allegations that WaMu failed to disclose that:

- WaMu lowered underwriting standards in order to meet loan production numbers.  *See In re Washington Mut. Mortg. Backed Sec. Litig.*, 2012 WL 2995046, at *2 (W.D. Wash. July 23, 2012) ("Exceptions were approved regularly on loans that did not meet guidelines, many times based on no reason other than to just make more loans") (quoting plaintiffs' evidence); and

---

[29]    *Id.* at p. 135-36.

- WaMu's internal reports showed very high error/defect rates in its loan pool. *See id.* at *3 ("as of July 2006, WaMu's internal risk assessment found 20.7% of loans had 'medium' events, meaning that there was 'collateral, credit and document errors considered non-critical in isolation but [which] have the potential to cause a material impact when combined with other risk factors.' … By January 2007, 44.2% of all retail home loans were found to be less than satisfactory. … And an internal review in February 2007 concluded that only 40 to 60 percent of loans were underwritten on a satisfactory basis").

83.     Not surprisingly, WaMu's substandard lending and underwriting practices have materialized in increasing default rates and substantial recognized losses in the WaMu Trusts, as detailed below at ¶¶87-88, 90.

**B.      The WaMu Trusts' Significant Losses and Delinquencies Alerted the Trustees to Breaches of WaMu's Representations and Warranties**

84.     As trustees, LaSalle, BOA and U.S. Bank provided monthly periodic reports to Certificateholders of the WaMu Trusts.  These periodic reports contained detailed information about the WaMu Trusts, including an accounting of the funds available for distribution to Certificateholders, a report on the mortgage loans contained in the WaMu Trusts, loan delinquency information, and the amount of losses sustained by the WaMu Trusts.

85.     These monthly reports from LaSalle, BOA and U.S. Bank – ***the trustees empowered to protect the WaMu Trusts' and Certificateholders' interests*** – have consistently shown an increasing amount of losses and 3-month default rates (three or more missed payments by borrowers) for a number of mortgage loans included in the WaMu Trusts.

86.     Thus, even if the Trustees were completely ignorant of WaMu's questionable underwriting practices through negative news reports, MBS-related lawsuits, and the Senate Report, ***their own monthly default reports*** have alerted the Trustees to serious problems in the WaMu Trusts at any relevant time.

87.     Losses and defaults continue to occur.  As reported in the WaMu Trusts' July 2013 monthly reports, the WaMu Trusts included in this Complaint have collectively suffered

recognized losses of over $760.3 million since inception.  Moreover, each of the WaMu Trusts has also reported an alarmingly high percentage of delinquent loans remaining in the trust – as high as 28.7% – where losses will likely be recognized in the near future.

88.     The following chart details – for each of the WaMu Trusts at issue in this case – the trust's reported cumulative recognized loss, the percentage of loans in the trust that have caused the trust to recognize a loss, and the percentage of loans remaining in the trust that are currently delinquent (and that will likely cause the trust to recognize future losses):

| Trust Name | Cumulative Recognized Losses by Trust (millions) | % Original Loans in Trust Causing a Recognized Loss | % Remaining Loans in Trust Delinquent by at least 90 Days |
|---|---|---|---|
| WMALT 2005-9 | $37.5 | 10.2% | 14.0% |
| WMALT 2006-2 | $53.2 | 17.6% | 15.3% |
| WMALT 2006-AR1 | $149.0 | 33.7% | 28.7% |
| WAMU 2005-AR15 | $205.2 | 15.8% | 17.4% |
| WAMU 2005-AR19 | $120.2 | 10.5% | 12.7% |
| WAMU 2006-AR19 | $195.2 | 26.6% | 19.0% |

(as of July 2013 monthly reports)

89.     As noted above, the Trustees were on actual notice of these increasing metrics as they tracked and reported them to Certificateholders on a monthly basis.  Those monthly reports showed high delinquency and mounting recognized losses beginning in at least 2008 and continuing to this day.

90.     The Rating Agencies, cognizant of the quality of the mortgage loans included in the WaMu Trusts, have lowered their investment ratings on many of the WaMu Trust Certificates.  Originally rated as "AAA" or "Aaa" investment grade, many of the WaMu Trust Certificates are now rated as "junk" or of non-investment grade quality:

| WaMu Trust Certificate | Ratings History[30] |
|---|---|
| WMALT 2005-9 (3CB tranche) | Rating at Issuance (October 2005):<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br>Downgrade:<br><br>Moody's: "B2" – "considered speculative and are subject to high credit risk" (February 2009)<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" (July 2009)<br><br>Current Rating:<br><br>Moody's: "Caa1" – "judged to be speculative of poor standing and are subject to very high credit risk"<br><br>S&P: "D" – "in payment default" |
| WMALT 2006-2 (2CB tranche) | Rating at Issuance (February 2006):<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br>Downgrade:<br><br>Moody's: "Caa1" – "judged to be speculative of poor standing and are subject to very high credit risk" (February 2009)<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" (July 2009)<br><br>Current Rating:<br><br>Moody's: "Ca" – "highly speculative and are likely in, or very near, default, with some prospect of recovery of principal and interest"<br><br>S&P: "D" – "in payment default |

---

[30]     All quoted rating explanations in this passage are from S&P's "Standard & Poor's Ratings Definitions" (June 2013) or from Moody's "Rating Symbols and Definitions" (June 2013).

| WaMu Trust Certificate | Ratings History[30] |
|---|---|
| WMALT 2006-AR1 (A1A tranche) | <u>Rating at Issuance (January 2006)</u>:<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br><u>Downgrade</u>:<br><br>Moody's: "B3" – "considered speculative and are subject to high credit risk" (February 2009)<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" (February 2010)<br><br><u>Current Rating</u>:<br><br>Moody's: "Caa3" – "judged to be speculative of poor standing and are subject to very high credit risk"<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" |
| WaMu 2005-AR15 (A1A2 tranche) | <u>Rating at Issuance (November 2005)</u>:<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br><u>Downgrade</u>:<br><br>Moody's: "Caa2" – "judged to be speculative of poor standing and are subject to very high credit risk" (December 2010)<br><br>S&P: "B+" – "more vulnerable to nonpayment … but the obligor currently has the capacity to meet its financial commitment on the obligation" (October 2011)<br><br><u>Current Rating</u>:<br><br>Moody's: "Caa2" – "judged to be speculative of poor standing and are subject to very high credit risk"<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" |

| WaMu Trust Certificate | Ratings History[30] |
|---|---|
| WaMu 2005-AR19 (A1A2 tranche) | <u>Rating at Issuance (December 2005)</u>:<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br><u>Downgrade</u>:<br><br>Moody's: "Caa1" – "judged to be speculative of poor standing and are subject to very high credit risk" (December 2010)<br><br>S&P: "BBB-" – "adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation" (November 2012)<br><br><u>Current Rating</u>:<br><br>Moody's: "B1" – "considered speculative and are subject to high credit risk"<br><br>S&P: "BBB-" – "adverse economic conditions or changing circumstances are more likely to lead to a weakened capacity of the obligor to meet its financial commitment on the obligation" |
| WaMu 2006-AR19 (1A1A tranche) | <u>Rating at Issuance (December 2006)</u>:<br><br>Moody's: "Aaa" – "judged to be of the highest quality, subject to the lowest level of credit risk"<br><br>S&P: "AAA" – "capacity to meet its financial commitment on the obligation is extremely strong"<br><br><u>Downgrade</u>:<br><br>Moody's: "Caa3" – "judged to be speculative of poor standing and are subject to very high credit risk" (February 2009)<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" (October 2009)<br><br><u>Current Rating</u>:<br><br>Moody's: "Caa2-" – "judged to be speculative of poor standing and are subject to very high credit risk"<br><br>S&P: "CCC" – "currently vulnerable to nonpayment, and is dependent upon favorable business, financial, and economic conditions for the obligor to meet its financial commitment on the obligation" |

91.    The increasing delinquency trends, recognized losses, and ratings downgrades are the direct result of the poor quality and performance of the mortgage loans serving as collateral for the WaMu Trusts and have been amplified by the Trustees' failure to carry out their statutory and contractual obligations to protect Certificateholders.

IV.    **Defendants Have Failed To Take Required Actions to Protect Certificateholders**

92.    Although the Trustees have been on actual notice of defective mortgage files and WaMu's deficient lending practices and underwriting standards for years (as the result of public reports, lawsuits, exception reports, and the increasing delinquency and loss rates for the WaMu Trusts), the Trustees have not taken a single action to protect the Certificateholders, much less act as a prudent person would act, as required by the TIA and Sections 2.07, 2.09, and 8.01(a) of the PSAs.

93.    Demonstrative of what a prudent person would do in the Defendants' situation, as required by the PSAs and the TIA, BOA and U.S. Bank needed to look no further than what Deutsche Bank, as trustee for the similarly situated WaMu-DB Trusts, did to protect the WaMu-DB Trusts' certificateholders.

94.    Deutsche Bank, in a similar trustee position to that of BOA and U.S. Bank, filed the Deutsche Bank Proof of Claim with the FDIC (as receiver for WaMu) in December 2008 asserting that WaMu had breached its obligations under the respective PSAs.[31]  As discussed below, the PSAs for the WaMu-DB Trusts do not materially differ from the PSAs at issue here.

95.    The Deutsche Bank Proof of Claim alleged, among other things, that "WaMu is … subject to Repurchase Claims with respect to **missing or defective documentation in mortgage loan files**," and stated:

---

[31]    *See* Exhibit E.

> The Governing Documents generally provide that if a material defect in any Mortgage File is discovered which may materially and adversely affect the value of the related Mortgage Loan, or the interests of the Trustee (as pledgee of the Mortgage Loans) the Noteholders or the Certificateholders in such Mortgage Loan, then the responsible party shall cure such defect, repurchase the related Mortgage Loan at the purchase price or substitute a qualified substitute mortgage loan for the related Mortgage Loan upon the same terms and conditions set forth for breaches of representations and warranties as to the Mortgage.[32]

96.     The Deutsche Bank Proof of Claim further alleges that WaMu received "on an ongoing basis, document exception reports with respect to missing or defective loan file documents."[33]   On information and belief, similar "ongoing" exception reports detailing mortgage deficiencies in the WaMu Trusts at issue here were provided by LaSalle (or its agent), as the Original Trustee, to WaMu when LaSalle reviewed, or caused its agent to review, the mortgage files at the time of the WaMu Trusts' creation.

97.     BOA and U.S. Bank were likewise aware of such mortgage deficiency reports as Trustees under the PSAs because these reports were among the "Mortgage Files, related documents, statements and other property" provided to them pursuant to Section 8.08 of the PSAs as Successor Trustees to LaSalle.

98.     The Deutsche Bank Proof of Claim also sought to enforce Deutsche Bank's rights as trustee to access the full loan origination files and enforce the WaMu-DB Trusts' rights pursuant to the PSAs.   Despite the fact that "WaMu's denial of counterparties' contractual inspection rights has deprived those parties of the ability to detect and quantify specific breaches of Representations and Warranties," Deutsche Bank knew, based on a reasonable investigation of

---

[32]     *Id.* at p. 5.   Deutsche Bank defines the "Governing Documents" as, collectively, the Pooling and Servicing Agreements, Servicing Agreements, Indentures or Trust Agreements, and related ancillary agreements for the WaMu-DB Trusts.

[33]     *Id.*

its records and news reports that WaMu had breached its obligations and requested that "claimants … be given reasonable access and time to investigate their claims."[34]

99.    The Deutsche Bank Proof of Claim also estimated, taking into account industry information regarding frequency of breaches of representations and warranties in portfolios of mortgage loans similar to those sold by WaMu to the WaMu-DB Trusts, the performance of the mortgage loans held by the WaMu-DB Trusts, and the severity of losses experienced by the WaMu-DB Trusts to date and anticipated in the future, that the relevant WaMu-DB Trusts had "*claims in respect to breaches of Representations and Warranties, in the estimated range of $6.764 billion to $10.146 billion*."[35]

100.    When the FDIC failed to respond to the Deutsche Bank Proof of Claim, Deutsche Bank filed a federal lawsuit against the FDIC (in its capacity as Receiver of WaMu) to protect the WaMu-DB Trusts' rights (the Deutsche Bank Litigation).[36]

101.    The Amended Complaint in the Deutsche Bank Litigation, filed on September 8, 2010 and attached hereto as Exhibit F, contained allegations similar to those set forth in the Deutsche Bank Proof of Claim.  The Amended Complaint also detailed WaMu's numerous failures to fulfill its obligations under the relevant governing agreements, including "WaMu's Notice Obligation," "WaMu's Repurchase Obligation," "The Trustee's Access and Indemnification Rights" and "WaMu's Servicing Obligations."

102.    Among other evidence cited in support of the allegations in the Deutsche Bank Litigation, Deutsche Bank cited the April 2010 findings of the U.S. Senate Permanent

---

[34]    *Id.* at p. 4.

[35]    *Id.* at p. 5.

[36]    *See Deutsche Bank Nat'l Trust Co. v. Fed. Deposit Ins. Corp.*, No. 09-cv-1656 (D.D.C.).

Subcommittee on Investigations as evidence of WaMu's breaches of its representations and warranties:

> Based on the Senate Subcommittee's findings, as well as the reports of other governmental agencies, *__the Trustee has reason to believe that many of the mortgage loans in the Trusts do not comply with the Representations and Warranties and that WaMu breached the Representations and Warranties__*, which breaches had a material and adverse effect on the value of the loans or the interests of the Trusts therein.[37]

103.     News reports of WaMu's deficient origination practices and public filings by WaMu proved sufficient for Deutsche Bank to file the Deutsche Bank Proof of Claim and the Deutsche Bank Litigation.  This same information was available to the Trustees yet none of the Trustees acted to protect Certificateholders as is required by the PSAs and the TIA.  Moreover, the breaches of representations and warranties under the PSAs would have been available to the Trustees from the same type of exception reports that Deutsche Bank cited in the Deutsche Bank Proof of Claim.

104.     Despite having access to the same information and being governed by the same set of obligations set forth in the PSAs and pursuant to the TIA, BOA and U.S. Bank failed to file a timely proof of claim in WaMu's bankruptcy, failed to attempt to submit a late-filed claim pursuant to FDIC rules, failed to enforce the WaMu Trusts' rights against either the FDIC or JPMC (as receiver and/or successor in interest, respectively) in violation of Section 8.01(a) of the PSA and the TIA, 15 U.S.C. §77ooo(c), and failed to take any other acts to protect Certificateholders as required by the PSAs and the TIA.  The Trustees' failure to protect Certificateholders is a breach of the Trustees' obligations under the PSAs and is a violation of their obligations under the TIA.

---

[37]     Exhibit F at p. 25.

105.    Upon information and belief, including from a review of the allegations and facts detailed by the Deutsche Bank Proof of Claim and Deutsche Bank Litigation, the WaMu Trusts also contain a significant number of mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties contained in the PSAs and MLPAs.

106.    In other situations, Defendant U.S. Bank has acted as a "prudent person" would. For example, U.S. Bank, in its capacity as trustee for two Merrill Lynch Mortgage Investors Trust MBS, filed a New York state court complaint against Merrill Lynch Mortgage Lending (among others) in December 2012 seeking "to enforce their contractual rights against the parties that orchestrated the securitizations and created the two Trusts, sold defective loans into the Trusts, and have refused to repurchase such loans in violation of the contracts governing the securitizations" (the "Merrill Litigation").[38]

107.    In a situation similar to the one involving the WaMu Trusts in the instant case, in the Merrill Litigation, U.S. Bank alleged in its complaint that:

> In sum, Merrill has breached the [Mortgage Loan] Sale Agreements and the PSAs. ***These breaches materially and adversely affect the value of the Mortgage Loans and the interests of the Certificateholders therein*** because, among other things, the risks of delinquency and default associated with the Mortgage Loans were higher than what the Trusts bargained for, and, ***as a result, the value of the Mortgage Loans and Certificates is diminished***. Wilshire's and Bank of America's likely conduct as servicers likewise breaches their obligations under the PSAs as Servicer.[39]

108.    As detailed in U.S. Bank's complaint in the Merrill Litigation, "a review of origination and servicing filed shows breaches of representations and warranties regarding the

---

[38]     Exhibit C.

[39]     *Id.* at p. 8-9.

mortgage loans," including breaches of 73% of the loans in one trust, and 76% of the loans in the second trust.[40]   Such breaches included misstatements about: (i) borrowers' incomes and employment; (ii) borrowers' debts; (iii) debt-to-income ratios; (iv) properties' appraised values; (v) loan-to-value and combined loan-to-value ratios; and (vi) properties' owner-occupancy statuses.[41]

109.   Having discovered the truth about the deficiencies in the mortgage loans contained in the WaMu Trusts, both BOA and U.S. Bank were under an obligation to behave as a "prudent person" would pursuant to Section 8.01(a) of the PSAs and the TIA, 15 U.S.C. §77ooo(c); as Deutsche Bank did with regard to the WaMu-DB Trusts and as U.S. Bank did with regard to the Merrill Lynch Mortgage Investors Trusts.   Moreover, pursuant to Section 8.01(d) of the PSAs and the TIA, 15 U.S.C. §77ooo(b), the Trustees were obligated to provide Certificateholders notice of Events of Default.

110.   Despite specific information available to the Trustees regarding breaches of WaMu's representations and warranties, defective mortgage files populating the WaMu Trusts, and WaMu's failure to cure, substitute, and replace mortgage loans with deficient mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties, the Trustees have done nothing to protect the Certificateholders and have failed, in violation of the PSAs and the TIA, to, *inter alia*:

- **provide the required notice to WaMu of defective mortgage files and breaches of WaMu's representations and warranties** (as required by Sections 2.07 and 2.09 of the PSAs);

- **take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage**

---

[40]     *Id.* at p. 19.

[41]     *Id.* at p. 19-30.

**loans affected by breaches of WaMu's representations and warranties** (as required by Section 8.01(a) of the PSAs and the TIA, 15 U.S.C. §77ooo(c)); and

- **provide the required notice to the Certificateholders of Events of Default** (as required by Section 8.01(d) of the PSAs and the TIA, 15 U.S.C. §77ooo(b)).

## V.    The Trustees Are Responsible To Certificateholders For The Credit Losses In The WaMu Trusts

111.    The Trustees' ongoing failure to enforce the WaMu Trusts' rights, and their violations of their contractual and statutory duties under the PSAs and the TIA, along with their negligence in performing and failing to perform these duties, have caused the Certificateholders to suffer significant damages.

112.    Both the poor credit quality of the underlying WaMu Trust collateral (the mortgage loans) and the significant documentation deficiencies in the mortgage files for mortgages continued in the WaMu Trusts have contributed to significant delinquencies in payments to the Certificateholders, and have increased the severity of the WaMu Trusts' losses, leading to re-rating of the WaMu Trust Certificates and a substantial decline in the value and prices of the WaMu Trust Certificates purchased by Plaintiffs and the class.

## CLASS ACTION ALLEGATIONS

113.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all current and former investors who acquired certificates in the WaMu Trusts identified at ¶2, for which Defendants served as Trustees, and suffered losses as a result of Defendants' misconduct alleged herein (the "Class").  Excluded from the Class are Defendants, WaMu, JPMC, and any of their related entities or affiliates, their officers and directors.

114.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time

and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Defendants, or by others in the MBS market, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in class actions.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

115.    Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.    Whether WaMu: (i) populated the WaMu Trusts with mortgages with defective loan files; (ii) breached its representations and warranties in the MLPAs; and (iii) failed to fulfill its obligations under the PSAs to cure, substitute, and replace mortgage loans with deficient mortgage files and/or mortgage loans affected by breaches of WaMu's representations and warranties;

b.    Whether Defendants breached their contractual duties to Certificateholders under the PSAs by failing to provide notice to WaMu of mortgage loans with deficient mortgage files and/or mortgage loans affected by breaches of WaMu's representations and warranties;

c.    Whether Defendants breached their contractual duties to Certificateholders under the PSAs by failing to act as a prudent person to enforce the WaMu Trusts' repurchase rights with respect to mortgage loans with deficient mortgage files and/or mortgage loans affected by breaches of WaMu's representations and warranties;

41

    d.   Whether Defendants breached their contractual duties to Certificateholders under the PSAs by, after an Event of Default, failing to provide notice to the Certificateholders of the Event of Default;

    e.   Whether Defendants violated the TIA by, after an Event of Default, failing to act as a prudent person to enforce the WaMu Trusts' repurchase rights with respect to mortgage loans with deficient mortgage files and/or mortgage loans affected by breaches of WaMu's representations and warranties;

    f.   Whether Defendants violated the TIA by, after an Event of Default, failing to provide notice to the Certificateholders of the Event of Default;

    g.   Whether Defendants were negligent when carrying out their duties and obligations under the PSAs and the TIA; and

    h.   Whether, and to what extent, Plaintiffs and members of the Class have suffered damages as a result of Defendants' breaches of their statutory and contractual duties and the proper measure of damages.

116.    Plaintiffs' claims are typical of those of the Class because Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

117.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and MBS litigation.

118.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all Class members is impracticable.  There will be no difficulty in the management of this action as a class action.

## FIRST CLAIM

### Violation of the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq*.

119.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

120.    Congress enacted the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, *et seq*., to ensure, among other things, that investors in certificates, bonds, and similar instruments have adequate rights against, and receive adequate performance from, the responsible trustees.  *See* 15 U.S.C. §77bbb.

121.    The WaMu Trusts' PSAs are "indentures," and each of the Defendants is an "indenture trustee," within the meaning of the TIA.  15 U.S.C. §77ccc(7), (10).  Moreover, the TIA applies to and is deemed to be incorporated into the PSAs and the related WaMu Trusts. 15 U.S.C. §77ddd(a)(1).  As detailed above, Defendants have violated multiple provisions of the TIA.

122.    The TIA requires that the Trustees inform Certificateholders of "notice of all defaults known to the trustee, within ninety days after the occurrence thereof."  15 U.S.C. §77ooo(b) (citing 15 U.S.C. §77mmm(c)).  Here, there were numerous Events of Default, including the failure of the WaMu to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties as required.

123.    The Trustees have no good faith reason for failing to provide notice to Certificateholders of those Events of Default.  By failing to provide such notice, Defendants violated the TIA.

124.    The TIA also required, in case of default, that the Defendants exercise their rights and powers under the PSAs as a prudent person would, under those circumstances, in the conduct of his own affairs.  15 U.S.C. §77ooo(c).

125.    Given the importance of the defaults set forth herein, which have impaired the rights of Certificateholders to collect their full principal and interest and reduced the value of the WaMu Trusts, a prudent person would have exercised all of his rights to, among other things, enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties as required.

126.    Certificateholders could have been protected from the significant losses (attributable to delinquent and defaulting mortgage loans contained in the WaMu Trusts) through the Trustees' enforcement of WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties – which was designed precisely to limit the number of delinquent and defaulting mortgages in the WaMu Trusts.  By failing to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties, Defendants violated the TIA.

127.    Defendants are liable to Plaintiffs and the Class for damages incurred as a result of their violations of the TIA.

<u>**SECOND CLAIM**</u>

<u>**Breach of Contract**</u>

128.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

129.    As set forth in detail above, the WaMu Trusts incorporated the PSAs, and the PSAs as a matter of law incorporated the provisions of the TIA.  Under the PSAs, Defendants owed the Certificateholders a duty to perform specific acts, including to:

- provide the required notice to WaMu of defective mortgage files and breaches of WaMu's representations and warranties (as required by Sections 2.07 and 2.09 of the PSAs);

- take any prudent action to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties (as required by Section 8.01(a) of the PSAs); and

- provide the required notice to the Certificateholders of Events of Default, including WaMu's failure to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties (as required by Section 8.01(d) of the PSAs).

130.    Defendants breached their duties by failing to notify WaMu of defective mortgage files and breaches of WaMu's representations and warranties, by failing to enforce WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties, and by failing to provide Certificateholders notice of Events of Default.

131.    Defendants' breaches of their contractual duties reduced the amount of money collected on the mortgage loans in the WaMu Trusts, significantly increased the severity of the WaMu Trusts' losses, and diminished the value of each of the WaMu Trusts.

132.    As detailed above, an Event of Default occurs under several situations defined in Section 7.01(a)(ii) of the PSAs.  Here, there were numerous Events of Default, including the failure of WaMu to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties as required.

133.    Defendants had notice of numerous Events of Default.

134.    These Events of Default impaired the rights of Certificateholders to collect their full principal and interest, and reduced the value of the WaMu Trust Certificates.

135.    An Event of Default triggers the Trustees' obligation under Section 8.01(a) of the PSAs to use all of their powers under the PSAs and at law to protect the WaMu Trusts (and by extension, the Certificateholders) as a prudent person would in conducting their own affairs.

136.    A prudent person would have exercised all of its rights to recover for those Events of Default, including enforcing WaMu's obligation to cure, repurchase, or substitute mortgage loans with defective mortgage files and mortgage loans affected by breaches of WaMu's representations and warranties.  By failing to take such action, Defendants breached the PSAs and damaged Plaintiffs and the Class.

137.    Additionally, an Event of Default triggers the Trustees' obligation under Section 8.01(d) of the PSAs to issue notice to the Certificateholders of the Event of Default within ninety days after the occurrence of the Event of Default.

138.    The Trustees have no good faith reason for failing to provide notice to Certificateholders of those Events of Default.  By failing to provide such notice, Defendants breached the PSAs and damaged Plaintiffs and the Class.

139.    Plaintiffs substantially performed all obligations required for investing in the WaMu Trust Certificates.

140.    Defendants are liable to Plaintiffs and the Class for the losses they suffered as a direct result of Defendants' failure to perform their contractual obligations under the PSAs.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for relief and judgment, as follows:

A.      Awarding compensatory damages and/or equitable relief in favor of Plaintiffs and the Class against Defendants for breaches of their statutory and contractual duties in an amount to be proven at trial, including interest thereon;

B.      Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

C.      Such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August 23, 2013

KESSLER TOPAZ
MELTZER & CHECK, LLP

Sean M. Handler
Darren J. Check
Joseph H. Meltzer
Edward W. Ciolko
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
shandler@ktmc.com
dcheck@ktmc.com
jmeltzer@ktmc.com
eciolko@ktmc.com

*Attorneys for Plaintiffs*